Morning Mr. Chief Justice, Associate Justices, Mark Ferrario appearing on behalf of the appellant, Vegas VP, and before I begin I'd like to reserve three minutes for rebuttal and also I would like to thank the court for accommodating my travel schedule and advancing this argument one day. It was greatly appreciated. This case involves a dispute over an insurance policy and some very specific language in the insurance policy. I think the court knows if it read the papers that this case involved a building that was under construction, it was in the Las Vegas area, and in December of 2004 the building, while under construction, experienced severe water damage as a result of some very significant rain events that hit the Las Vegas area. At the point in time that the rain events occurred, the building, contrary to the position taken by Ace, actually had roofs, walls, and windows. The roofs, walls, and windows that existed at that time were put in place by the contractor. However, they were not permanent roofs, walls, and windows. They were temporary roofs, walls, and windows. And I don't think there's any dispute as to the fact that the general contractor was attempting to protect this building during the rainstorms and during the course of construction by employing temporary protection measures. Is there any dispute as to how the Fisqueen tarp was placed, if you follow me, and does that have any legal significance? Was just the tarp thrown over there or was it nailed down? To answer the second part of your question first, I personally don't think there's any legal significance to that, but there is no question that the contractor took great pains to ensure that the tarp did not come off. Through sandbagging, through a variety of methods, it was the intent of the builder to erect a temporary roof to protect the structure from rain during the course of construction. I don't think anyone would seriously consider that. Now, ACE may say, well, they could have done more or they should have had five sandbags and not three, but there is no question on anyone's part that the contractor was attempting to employ temporary protection measures. And, in fact, they had segregated one floor and went up to that floor and tried to seal it off completely so that it would capture the rain, shed it off to the side of the building, and prevent it from going down the building's core. So there's no dispute that the contractor was taking great pains to employ these temporary protection measures. After the rain events, the building endured significant damage. This was like a record storm in Las Vegas. The general contractor filed a claim, and my client also notified the insurance company that it was going to file a claim. Now, my client's claim was for soft costs, and it was impossible at that time to determine what those damages were. But there's no dispute that the insurance company knew that there were going to be two claims coming from the same policy. And, by the way, my client sent additional insured under that policy, so it wouldn't be unusual for my client to tag along with the general contractor. The general contractor is the primary. You say additional insured so your client didn't have to pay any money? Well, you're right. Well, that's not entirely true because my client's paying the general contractor, and a portion of his fee is going to the insurance company. So, yes, we did pay for this policy. And there's no dispute that they extended benefits to us under this policy. No dispute whatsoever. What happens is, and this argument will take me to a couple of points I want to make at the end, but I want to go back to the roof issue first. But what happens is two claims arising under the same policy from the same event are treated much differently. Okay? But the first thing I want to address is this threshold issue under the policy as to whether temporary protection can satisfy the definition of roof, windows, and walls. And we argued this extensively in front of Judge Sandoval, and I believe, with all respect to Judge Sandoval, I think he reached the wrong conclusion. There is only one case, believe it or not, that has been decided that on facts similar to this, on this issue. And that case was the Homestead case, which we cite in our brief prominently. And in that case, the Oklahoma court determined that in a project that is under construction, as opposed to all of the other cases that they cite, where an existing building is in place and being modified, in a project that's under construction, temporary protection satisfies the definition of roof. And I think that is a sound result. And all the cases they cite are factually an opposite to what we have here. And quite frankly, I'm not even sure that we have to even look at those cases. Because what they really wanted the lower court to do, and they achieved that with some success, and now what they want this court to do is rewrite this policy. I would simply ask you to look in the policy and see if you can find the word permanent roof, permanent windows, permanent walls. It doesn't exist. And in order for this court or the lower court to uphold it. Could you explain to me the nature of the policy itself? The policy was a builder's risk policy that was procured at the beginning of construction to cover things that occurred during the course of construction. That's what differentiates this policy from all of the other policies in the cases that they cite. Okay? It was procured to specifically cover risks that unfold during the course of construction. And to speak to your point, we had to get, well, we didn't, but our general contractor had to provide them with construction schedules. They knew that the process that was going to be employed here was one very common in the Las Vegas area. You build six, seven floors up, and then you start putting finishes in down, and you build higher, and you do temporary protection. And it generally works quite well. Here it did not. Was it because of the record rainfall event? Was it because of the temporary protection being adequate? I can't tell you. But here it didn't work. And when does the benefit of this policy expire? I mean, when the building is all completed? Yes. When a specific occupancy attaches or something? I think it was a 20-month policy, and it was designed to cover the course of construction. So your Honor is correct. That's what this policy was designed to cover. It wasn't to go on into the future, and there would be other policies obtained once the building was completed. So to speak to your point, we covered this in our brief. This is what the parties bargained for. This shouldn't be a surprise to ACE. They're issuing a course of construction policy, and at various points in time during the course of construction, different measures are going to be employed to protect that building. Different roof means and methods may be employed. If you look at the roof in the abstract, you might think that it's a permanent fixture, right? Certainly. But I guess if you look at it in context of this policy and the structure that was going up, it might well just be a temporary roof. And it speaks to the ambiguity point, okay? If they wanted to, in this context, to restrict coverage, then all they had to do was to say, this policy will not apply until the permanent roof is in place. This policy will not apply until the permanent windows are in place. They didn't do that. Which leads me back to if you look at the language of the policy, it says the buildings, windows, roofs, and doors. And my contention is you have to look at that language in light of when the loss occurred. And when this loss occurred, that building's windows, walls, and roof consisted of the temporary protection employed by the contractor. Who has the burden here on this exception to the exclusion? Well, we demonstrated that this was an all-risk policy and that it covered this event absent an exclusion. It's their obligation to prove the applicability of the exclusion. Do they have to negate the exception to the exclusion? I believe they do in this context. And we covered that in our brief. And granted, this is the minority position in the country on this point. There are a couple of cases that deal specifically with this. But I think the minority position is actually the one that makes the most sense. In an insurance setting, we have to prove that our loss is covered under the policy generally. Then if they want to prove an exception or an exclusion, they have to prove that. Now, what they want us to do is to say, okay, we've now proven the exclusion applies. Now, we want you to prove that the exception to the exclusion applies. It's this burden shifting, which I think is somewhat nonsensical. I think it, if, and really I think you have to parse that exclusion. And what they want to say is now there's an acceptance to the exclusion. It's all part of the same paragraph. It's not a separate paragraph. It's not somewhere else in the policy. It's all part and parcel of that exclusion. And so I believe once we demonstrate that it was covered under the policy, they have to move forward and demonstrate that the exclusion applies and that no exceptions to the exclusion applies. And granted, that's the minority position, but we covered that in our brief. To do otherwise creates really this flip-flopping burden, and it becomes really a trap for the unwary, which is the point I want to get to, which is the latches argument, because this has kind of been lost in, I think, in the case to this point. We submitted our claim. There's no dispute to that. What happened was they treated two, as I said before, two insurers similarly situated in a different manner. And things that disturb me here in this context is in September of 2005, the insurance company wrote a letter to Residential, and in that letter they have our claim number. And in this letter that they wrote in September of 2005, they denied coverage, not because they wanted us to track where all the water came from. They didn't raise this exception to the exclusion. What they said was in this letter, the multi-page letter, is that we're not covering this because we don't think that the temporary protection constituted a roof. That was September of 2005. They're writing to our general contractor, a co-insured under the policy. They include our policy number on there, and they say this is why we're denying the claim. In October of 2005, rather than tell us directly that we're denying your claim and we're denying it for this reason, they write us a letter and they say we're reserving our rights. There's a lot of language in here covering their backside, if you will. But what they say is we're going to treat you the same as we're going to treat your general contractor. Did the district court decide this issue? I don't believe the district court did decide it directly. I believe that the district court was somewhat confused over our latches argument and wrapped things up in there that we didn't intend. We didn't say they couldn't assert exclusion S. What we said is they can't. They're stopped from making us prove the exception to the exclusion. I don't think the judge got that. Let me ask you one minor question. And I don't realize the clock is ticking down, but we had issued an order that we asked you to respond to regarding diversity jurisdiction. Yes. And the response you gave us was that the general partnership is made up of one or the limited partnership is made up of one partner. How could that be? I'm sorry. You didn't respond. I'm sorry. You didn't respond yet. Do you have any response to that? I'm sorry. To be candid with the court, I don't think there's a diversity issue here. Off the top of my head, I don't remember the breakout of the partnership, but I don't think there's a diversity issue here. You mean you think they've satisfied it? Yes, I do. I don't think that's a serious contention. All right. Why is that? If the requirement is that in limited partners, you have to identify all the limited partners, and they've said this limited partnership, why does that not affect jurisdiction? I don't think that there are any limited partners as part of this. And, again, I'm speaking from memory going way back. That would destroy diversity, Judge Hugg. Was there at one time limited partners? Yes, there were. And, again, perhaps I should have looked into that when the order to show cause was issued, but it was directed at ACE, and I didn't get that. If it's important to the court, I can certainly supply a supplemental brief specifying the evolution of the partnership. Now, it has changed over time. People have been bought out. So I don't know what the condition of the partnership was at the time that the litigation was. All right. Well, I sort of jumped the gun, but we hadn't yet heard from you, so. With that, I think I'm into my rebuttal time. I'll give you another minute. Okay. Okay. So, in conclusion. Well, save it for rebuttal. You'll get your last word. Thank you. Good morning, Your Honors. I'll address the jurisdictional question first. The only, at the time that this declaratory judgment action was filed, there was only one known or disclosed partner. It was a general partner, Texas general partner. Previously before that, and I believe that that general partner bought out his G.T. Leach, which was a Nevada entity combined with a limited partnership with Randall Davis, a Texas partner. But we believe Mr. Davis bought him out by the time this case was filed. And the only partner that is disclosed in the records in any form or fashion is the Davis entity out of Texas. So there is. How can you have a partnership with only one partner? I don't know. All I can tell you is that's all that's disclosed. Is that a proper business entity under Nevada law? Well, I don't. Well, first of all, I don't believe that the entity has even got good standing under Nevada law. It had failed to file its corporate registration at the time of this. It had expired. So there is a possible, to me, legal issue as to whether they have a right to affirmatively challenge issues in the court as a no longer good standing entity. But they had expired. And that was the status. Well, I guess to some extent that's a technical defense that can be cured. I think it is a technical defense. All I know is jurisdictionally the only disclosed or known general partner is certainly diverse to the Pennsylvania entity being the Texas entity. And if there had been previously limited partners who got bought out for whatever reasons, they were not disclosed. And the only things that we knew from the case, and I think counsel can respond to that in his rebuttal, is that G.T. Leach is Nevada and Randall Davis is Texas. Let me address something quickly off the bat. If this Court looks at the statement of facts that were submitted by the parties, the rhetoric of counsel here, to be honest, means nothing. The statement of facts were undisputed that were submitted by the insurance company. There was no challenge to those statement of facts with regard to the methodologies by which Water entered this building. And the reality that this was the fourth occurrence that Water entered this building. And a general contractor in building the building has a right to decide in his course of development whether he is going to put in soft material into the interior of the building before he dries it up. This contractor decided he would take the business risk of putting in soft materials, drywall, et cetera, that was capable of rain damage without closing the building in. And, in fact, the testimony that is before the Court is that they had a multitude of openings, and the architect of the site testified that when he came to the site immediately after, the building had numerous openings that had no even attempt to close. And we list those all in the statement of facts, and we list those in the testimony. There is no testimony to the contrary. Notwithstanding the rhetoric that they were doing an excellent job putting up temporary covering, that's not the record before the Court. The further record is that your question, Your Honor, with regard to how was the tar placed is a critical question. First, we have the decision which I think does an excellent job in reviewing the history, the Aginski decision out of the District of Oregon in 2005 looks at these cases around the country, and it says a tarp is not a roof. And the policy stating that you have to have first damage to a roof, window, or wall, that that requires a permanent nature element that people can reasonably believe withstand the weather and the elements expected. But if the court doesn't buy those cases which we stand on and which the district court found to be controlling and goes to the next level, there are some cases that try and weigh how was the tarp applied. And in Aginski, the evidence put forth by the insured was we put up a tarp with a wood frame around it. I mean, we really tried to put down a tarp to provide some measure of weather protection. And the Aginski court said that's still not going to constitute it. In this case, before you, on summary judgment, standing before the challenge that we don't have a roof of any kind that was damaged, they did not put forth any evidence at all for the trial court or for this court to say, even if we don't accept that a tarp is a roof and we're willing to go, I mean, if we will accept a tarp as a roof, we won't require a permanent structure, which is contrary, I believe, to the vast majority of cases and the cases that should be controlling. The next level is, what did the insured put forward to say it is a roof? And here they didn't put forth anything. Your question is dead on point. If it's just laid up, is that, now, is that going to meet the criteria? If it has one sandbag on it, is that going to meet the criteria? There's no evidence before the trial court or this court to sustain some level of application of a tarp that can reasonably make it a roof or a wall or a window. But, as I said, go back and look at the undisputed facts. The undisputed facts are that this was a building that was a sieve, open, unprotected in a majority of ways with any protection whatsoever. And this was the fourth time that it occurred. Judge Payaz asked, I thought, a very good question about the context and what the purpose of this policy was. Can you give me a sense of what other risks this policy covered besides soft costs and delay? So, for example, would it cover if someone was hurt on the site? No. This is a builder's risk policy. It's not a liability policy. It's not a personal injury policy. It covers one and one thing only, insured property. And it covers those insured properties from, and this is very critical to understand it, from direct, and I'll read it so that the Court is very clear. It covers the insured property from. Which page of the excerpts of record are you reading from? Well, this is from, I'm reading, and I don't have the excerpt record, but it's from the insuring agreement. There's only one insuring agreement clause in the policy. It's on page 28 of 47 of the policy. And it's all risk of direct physical loss or damage to the property. That's all it insures. And it doesn't care whether there's negligence involved or non-negligence. It's did something happen that's direct physical loss to the property. And then it says for rain, we don't care how the rain entered the building. And there are some other cases which are non-applicable where they say that if the rain entered from an opening caused by any covered cause of loss, well, that any rain caused, excuse me, an exterior roof, window, or wall that is damaged and an opening is created by any covered cause of loss is not this policy. This policy is a roof, window, or wall which is damaged and an opening is created by two things, windstorm or hail. And in this case, we have a roof, window, or wall that was damaged. And we have no windstorm or hail which is causing an opening in an existing roof, window, or wall. Well, unless by their argument, which is that it covers temporary. And that's where I think the logic change is so needs to be so carefully analyzed. The Oginski decision and the majority of all the other decisions in the country say that a TARP, no matter how applied, doesn't constitute a roof, window, or wall. But if, and that's what the trial court held. But if this court says we're going to be more liberal than that, we're going to open it up to some measure of weighing, then the exclusion applies. And when you ask the question who has the burden of proof of the exception, the exclusion says if interior building space is wetted from rain, it's excluded. And then it says unless we have, unless the building or structure first sustains windstorm or hail damage to its roof, windows, or wall through which the rain and snow or sleet enter. Here, the insured has, again, and the Ninth Circuit on burden of proof has found in the decision of Arrowquip, 1994, that it weighed again across the courts around the country, and it said yes. The burden to prove the exception to the exclusion is on the insured where the insured has come forth and shown that the exclusion is applicable. Let me ask you this right here. What do you make of the Nevada Supreme Court's decision in Havas? Well, the Nevada Supreme Court decision is with regard to whether an exclusion applies, not to whether the exception to the exclusion applies. There is an exception in that policy in Havas. Well, I have not seen a case. What year is that case? Well, it's an old case, and it's a peculiar opinion, but it is from the Nevada Supreme Court. Okay. It's a 1959 case. And, you know, there's not much analysis. I'll grant you that. It's very short. Well, I'll be frank with the Court. We researched every issue, and both parties have basically represented to the Court we find no Nevada precedent on point with regard to the burden. And I'm not going to stand here and say that I can tell you the analysis of that case, because having read everything that I read, I didn't hit that case. But the Ninth Circuit looked at it. There's not a lot of Nevada law from the Nevada Supreme Court on this whole area, but there is some. And I'm surprised you wouldn't hit it when you heard it. Well, and if that case is and perhaps we can shoot me on that case, but the analysis is both parties stipulated rainwater. This is not a broken sprinkler, frozen pipe, sewage leak, or anything else that created water into the interior. This is rainwater into the interior of the building. And we stipulated under the Statement of Facts that it's rainwater into the interior of the building. There was no evidence brought forth by the insured other than a general argument, well, tarping, which we're not even going to say that tarping was everywhere because they can't, and they presented almost no evidence of any place there was tarping. But the issue then becomes what is the, what level, if you do not take Aginski and all the other cases and say tarping doesn't equate to a roof, window, or wall, what level of tarping was applied? Aginski said a wooden frame tarping applied doesn't constitute a window or roof. Here, they don't have any evidence presented to the trial court or this appellate court to raise the level of a roof that could meet it. So this builder could not expect any coverage under this policy until the permanent roof was in place. Is that right? And that makes Is that the general expectation of the building? If you leave openings throughout the building that allow rainwater in, a natural occurring thing would happen. No, but I mean, you know, as the structure goes up, and they don't in one day put the roof on and the siding on. No. It is a business decision, and believe me, they sued the contractor independently on, and the court asked what type of policy. This is not a liability policy. Right. So negligence of the contractor is not at issue. They sued them for negligence, and they went after them for failing to do what they should have done. This is a property policy. And, yes, the contractor and this building has absolute control to dry in a building before it puts in soft goods into the building. It's not. And, in fact, the homes How does the contractor dry in a building until the complete exterior is constructed under your view? Because you don't have a permanent roof until you finish the entire structure. And, Your Honor, that's correct, and that's a point that the district court noted, that while the contractor and the owner have their rights against each other liability-wise under liability policies, they can decide what to do. As far as the insurance company is, we do not want to insure the risk of insuring soft goods in a building until it's dried in. And they have the ability to do that. The majority of places that you construct where there's not a race and they're not trying to make extra profit by getting through properly, they dry in the structure. They apply the external elements. Otherwise, you have, you're going to this issue of Well, how would you dry in this 20-story project without completing the 20 stories? Well, Your Honor, after this happened the fourth time, the owner said, stop this nonsense, dry in the building, and then finish the work. And that's what they did, and they didn't have any more problems. Wait a minute. How do you dry in the building without completing the entire structure? Well, you put up the superstructure, and then you put up the exterior wall. This building, and the distinction is you build the superstructure and the exterior walls and the roof and the windows, and then you add in all of the internal soft goods after that point in time. And it's commonly done. So your position is, in the position of the carrier, is that the building, the exterior portion of the building has to be completed before there could be any coverage for rain damage? Unless you have a section of it that has suffered the damage that we've talked about, yes. If you have an open window, you have an open floor, and you allow rain to come in that and it just runs down the building, no, the insurer does not insure against that. And it makes no sense that it would. That's not a fortune. I'm not talking about the windows. I'm talking about the roof. Well, the roof is a part of it, but yes, you have to put in the roof. I know. I know that it is part of it, but I'm looking at the practicality of this. It would be that until the complete structure is made and you've got a permanent roof, there is no coverage the way you view it for rain damage that would come in through the roof. Your Honor, that's correct. If the rain came in through the unfinished roof area because it was not completed and it just rained and came in, there's no coverage for rain damage. There's coverage for every other damage that can happen to this structure during its construction that's not excluded. But if it's just raining and you didn't put a roof on, but you decided to take the risk of putting in your million dollars' worth of furnishings and rugs and carpet and it just rains on the building and it's damaged, no, that's not insured under the policy. That's what the exclusion is specifically meant not to cover. Okay. Is there a problem that the insurance company paid the GC's claim? No, Your Honor. We denied their claim. Well, first of all, the exclusion ask was directed to the GC first because they made a claim. And it was identified that exclusion ask may be applicable to reserve rights and we need to investigate. The owner who is before you now, Vegas, submitted their claim six months later, six months after this event happened. The very first time any claim came in from them, they were notified that exclusion ask may also apply. At no time when we were dealing with the GC did we ever remove exclusion ask, did we ever say it was non-applicable, did we ever admit there was any nature of coverage whatsoever. They settled on a compromise disputed basis because they understood that our position and we had finally gotten the discovery done and we were going forward with the summary judgment and we went to a mediation and settled the case. Okay. Thank you.  Your Honor. Thank you. Thank you. In listening to Mr. Johnson, it brought back memories of the dialogue in front of Judge Sandoval where Judge Sandoval was concerned about factual disputes and whether he could even move forward on this case. At that hearing, Mr. Johnson conceded, or else Judge Sandoval would not have ruled, that there was temporary protection up and that the temporary protection had in fact been damaged. Otherwise, we wouldn't even be here today. There are numerous factual disputes regarding the quantity and quality of the protection. I would concede that. But that's no moment here. For purposes of this ruling or for this case, this Court must assume there was temporary protection up, as Judge Sandoval did, and that that protection was damaged. So if Mr. Johnson wants to go back to court and argue the quality and quantity of that, if that's somehow now relevant to this case, I welcome that. And the fact that he's arguing so strenuously that there wasn't enough protection, he indicates that he knows he has a problem regarding this permanent versus temporary issue. And I think the Court's questioning points out why that is such a problem. They could have eliminated this issue simply by saying the building had to be dried in before any coverage was triggered. This Court asked Mr. Johnson what was covered under that policy. I waited for him to say something. All he did was look at the language and then I'll defy you to look at that and look at the exclusions and tell me what's covered. What this insurance company is trying to do is after the fact modify the policy and deprive my client of coverage. The issue here is whether or not this policy is ambiguous. I believe it is. I think that when it comes to the temporary permanent issue, it's the type of protection, the type of roof that's in place at the time of the loss. On the HAVIS issue, I think your question was spot on. Our Supreme Court said when an insured has proved a loss, apparently within the terms of the policy, which we did, the burden is on the insurer to show that the loss was produced by a cause which is accepted from the coverage. That's the Nevada law on that issue. And granted, a case from Nevada in 1959, it is somewhat short on analysis, but that's Nevada. When they say when the court says accepted from the coverage, isn't that really an exclusion? When it's accepted from the coverage, that's an exclusion, isn't it? I think that's correct, Judge Hugg. But what they're also saying is that water that came in through openings, unprotected openings, like a caulk joint, that that's accepted from coverage. And I think the HAVIS case covers that. And that's really a critical issue here. And that gets back full circle to the question you asked, is how can you treat two people under the same policy differently? And they are doing that. They want to dodge that. But I would just simply, and Mr. Johnson says they were treating us and considering our claim. That's not true. In September of 05. Why can't they treat two different people differently in any sort of a settlement process? This wasn't a settlement issue. This was a claim under an insurance policy where they owe both insurers concurrent duties of good faith and fair dealing. The facts are precisely the same. And more importantly, they denied our claim in 2005 January and never told us that. Had they told us that in January of, excuse me, September of 2005, we would have been able to take action earlier and possibly protected ourselves from some of the claims they're making now. There is no dispute that in the letter they sent to residential, they precisely indicated that our claim was being denied, and they never told us that going forward. And in the insurance context, I don't have to tell this court about the duties of good faith and fair dealing and the unfair claims practice aspect of this. With that, we think the lower court judgment should be reversed. Thank you for your time and attention. And, again, thank you for your time. Thank you. The case will be submitted at this time. We're going to take a very brief recess at this time. Thank you.
judges: Carney, Hug, Paez